IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AURORA COMMERCIAL CORP., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> LENOX FINANCIAL MORTGAGE CORP., <br><br> Defendant. <br> _____/ | 1:13-cv-01489-AWI-JLT <br><br> **ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT** <br><br> (Docs. 46, 52) |

## I. Introduction

Defendant Lenox Financial Mortgage Corporation ("Defendant"), and Plaintiffs Aurora Commercial Corporation, et al., ("Plaintiffs") have filed competing motions for summary judgment. The case surrounds the residential refinance loan (the "Loan") made to borrower, Samuel Gonzales ("Borrower"), and secured by a deed of trust against the real property commonly known as 3100 Greenbriar Way in Rosamond, California ("Subject Property"). In that transaction, Defendant was the loan originator, underwriter, and seller. Plaintiffs purchased the residential refinance loan. Plaintiffs allege that Defendant breached its contract and warranty under which it was obliged, as a loan originator, to ensure accuracy of representations regarding the loan it underwrote and repurchase the loan or indemnify Plaintiffs in the event of a defective or non-conforming loan. Plaintiffs contend that the loan contained misrepresentations regarding Borrower's gross personal income and the property's intended use and that Seller's employees were non-compliant with underwriting requirements. Defendant rebuts that Borrower provided

truthful information on his loan application because he reported the gross income earned by his sole proprietorship which is effectively his personal income and Borrower did not misrepresent his intended use because he occupied the Subject Property a major portion of each year for four years prior to seeking the Loan and had intended to continue to do so. Further Defendant contends that no underwriting violation took place because a stated income loan does not require that an underwriter verify the monthly income amount of a loan applicant. Both parties seek summary judgment. For the following reasons, Defendant's motion for summary judgment will be denied and Plaintiffs' motion for summary judgment will be granted.

## II. Background

Borrower is a commercial truck driver. In 1991, Borrower purchased a mobile home located at 1949 South Manchester Ave. in Anaheim, California. (Plaintiffs' Statement of Undisputed Facts ("PSUF") at ¶ 45.) In 2003, Borrower and his employees began making deliveries for a DHL contractor by the name of Velocity. (PSUF at ¶ 28.) While making deliveries for Velocity, Borrower used the unregistered business name "Mule Transport." (PSUF at ¶ 29.) In the same year, Borrower purchased the Subject Property, financed by a loan and secured by a deed of trust against the Subject Property. (PSUF at ¶ 46.) Borrower divided his time between the Subject Property and Anaheim property depending on where he was required to drive for Velocity. (Deposition of Samuel Gonzales, Doc. 53-2, Exhibit B ("Gonzales Depo.") at 40:2-20.)

On March 30, 2006, Lenox and LLB (predecessor in interest to Plaintiff Aurora Bank) entered into a loan purchase agreement by which Lenox was granted authority to underwrite loans for LBB. (PSUF at ¶ 12; *see* Doc. 13 ("Loan Purchase Agreement").) The agreement provided that Lenox would underwrite all loans for LBB in compliance with the LBB guidelines, specifically the "Seller's Guide." (*See* Doc. 54-2 ("Seller's Guide").)

In May of 2007, Borrower refinanced his home through Lenox with a "stated income" loan. (Stipulated Facts ("SF") at ¶ 4.) The loan amount was set at $231,300 and was secured against a deed of trust recorded against the Subject Property. (PSUF at ¶¶ 14-15; Doc. 47-9 at p. 5.) The loan application reflected that the Subject Property was Borrower's primary residence

and that his gross monthly income was $12,000. (PSUF at ¶¶ 15, 21.) Aurora purchased the loan from Lenox for $228,039.71. (SF at ¶ 5.) The purchase was pursuant to the terms of the Agreements and Seller's Guide. (SF at ¶ 6.) The Program Profile is a companion piece to the Seller's Guide (both refer to and rely upon each other) which contains a consolidated list of requirements for each loan type and the corresponding ratios and requirements. (*See* Doc. 54-11 ("Program Profile").)

The Seller's guide at Section 7 contains multiple representations, warranties, and covenants made by Defendant. The Seller's Guide indicates Defendant's acknowledgement that Plaintiffs purchased loans in reliance upon "the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter material to such purchase…." (Seller's Guide at § 701.) The terms of the Seller's Guide also indicate Defendant's agreement that, as to each mortgage loan, "[n]o document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading." (Seller's Guide at § 703(1).) In the event of a breach of the representations, warranties, or covenants, Defendant was under the obligation to repurchase the Mortgage Loan. (Seller's Guide at § 710.)

Borrower defaulted on the Loan on March 1, 2010. (Doc. 54 at p. 9.) The remaining principal on the loan at the time of default was $230, 444.77. (Doc. 54 at p. 16; Doc. 54-9 at p. 1.) On April 21, 2011, Plaintiffs recovered a net $71,909 from the sale of subject property after foreclosure. (*See* Doc. 54-12 at p. 1.) In a letter dated June 15, 2012, Plaintiffs demanded indemnification for their loss in the amount of $187,750.23. (*See* Doc 54-10; PSUF at ¶ 64.) Defendant refused to do so. (PSUF at ¶ 65.)

Plaintiffs now move for summary judgment on the grounds that the loan documents contained various misrepresentations which triggered Defendant's obligation to repurchase the Loan and Defendant's failure to do so constitutes a breach of contract.

3

### III. Legal Standard

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *see* Fed. R. Civ. P. 56(c)(1)(A).  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litigation,* 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex, supra,* 477 U.S. at p. 325).  If the moving party meets its initial burden, the burden shifts to the non-moving party to present evidence establishing the existence of a genuine dispute as to any material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e., it affects the outcome of the claim under the governing law, *see Anderson,* 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir.1987). In order to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita, supra,* 475 U.S. at p. 587 (citation omitted).
A court ruling on a motion for summary judgment must construe all facts and inferences in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See*

*Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

## IV. Discussion

<u>Breach of Contract Claim</u>

The Court evaluates Plaintiffs' claims for breach of contract under New York law pursuant to the choice-of-law provision in the parties' agreement. (Loan Purchase Agreement § 8 ("This Agreement and the Seller's Guide shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York.").)

Under New York law, the elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance by the plaintiff, (3) the defendant's failure to perform, and (4) resulting damage. *Aurora Commercial Corp. v. Approved Funding Corp.*, 2014 WL 1386633, 3 (S.D. N.Y. 2014) (*citing Clearmont Prop., LLC v. Eisner,* 872 N.Y.S.2d 725, 728 (N.Y. App.Div. 2009).) Furthermore, "[u]nder New York law, a loan seller's failure to repurchase non-conforming loans upon demand as required by a contract is an independent breach of the contract entitling the plaintiff to pursue general contract remedies for breach of contract." *Lehman Brother Holdings, Inc. v. PMC Bancorp,* 2013 WL 1095458, *4 (C.D. Cal. 2013) (citing, *inter alia*, *LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holding, Inc.,* 237 F.Supp.2d 618, 638 (D. Md. 2002).)

There is no dispute as to the first element of the breach of contract claim; a valid contract existed between the parties. (SF at ¶¶ 5, 6; *see* PSUF at ¶¶ 6, 12; *see generally* Loan Purchase Agreement.) There is similarly no dispute as to the second element; Plaintiffs performed their obligations under the contract. (SF at ¶ 5 ("Aurora purchased the loan from Lenox for $228,09.71").)

A dispute arises as to the third element of the breach of contract claim. Plaintiffs claim that Defendant breached the agreement when it failed to repurchase the defective or non-conforming loan. Defendant alleges that it complied with all underwriting requirements applicable to a stated income loan and Borrower did not misrepresent his income, employment or

5

occupancy, thus it was not in breach. Plaintiffs have identified four material defects which trigger Defendant's repurchase obligations: (1) underwriting violations, (2) income misrepresentation, (3) occupancy misrepresentation, and (4) misrepresentation regarding Borrower's compliance with the deed of trust. The Court only addresses the first two.

     As a preliminary matter, this Court notes that whether or not Borrower *knowingly* misrepresented his income or employment is not at issue in this suit. Similarly, whether or not Defendant *knew* that misrepresentations or other defects existed in the loan is without consequence. If misrepresentations or defects existed in the loan documents, regardless of whether the fault rests with Borrower or Defendant, then Defendant is in breach. (*See* Seller's Guide § 703(1) (where the Defendant warrants that "[n]either the Seller Application Package, the Loan Purchase Agreement, nor any statement, report or other document furnished or to be furnished by Seller … contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein not misleading."); § 703(12) (where the Defendant also warrants that "[n]o fraud was committed in connection with the origination of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Mortgage Loan File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations…."); *see also*, Doc. 55 ("Defendant's Reply") at p. 11 ("If the borrower lies, the shift is allocated to Lenox. If the borrower tells the truth but later defaults, that risk is allocated to Aurora.").) As a result, whether or not Defendant had an obligation to verify Borrower's income is not of consequence to this action (except insofar as it may be required under Seller's Guide § 502 to determine the reasonableness of the borrower's ability to repay the mortgage debt) since the risk of fraud or misstatement during origination was allocated to Defendant. The critical inquiries here are (1) whether Defendant failed to comply with one or more material underwriting requirements thereby breaching the contract, and (2) whether the parties had an agreement as to the meaning of "Gross Monthly Income" or "Base Employment Income" in the context of a self-employed borrower such that the Court could determine whether or not a misrepresentation has been made.

*1. Underwriting Procedure Compliance*

The parties agree that the loan issued to Borrower was a "Stated Income" loan. (SF at ¶ 4.) The parties further agree that the loan purchase agreement incorporates the provisions of the Seller's Guide (PSUF at ¶ 7; *see* Doc. 13 at p. 2.) Section 505.2 of the Seller's Guide provides that:

> Applicants will be qualified based on calculated Stable Monthly Income. Stable Monthly Income consists of those amounts and sources which are reasonably expected to continue. Income may be obtained from a variety of sources such as salary, bonus, commission, self-employment, etc. Typically, if the income can be verified as received for a reasonable time period (i.e., two or more years) and is likely to continue for at least three more years (refer to applicable Program Profile for details/variations), the income may be used as qualifying income.
>
> Each source of income must be reviewed with regard to the applicant's ability to service his/her total debt obligation. Varying types and levels of income documentation may be necessary for different types of income and programs.

(Doc. 54-2 at p. 32.) Plaintiffs direct the Court to the Seller's Guide at section 505.2-22, which specifies that self-employed "income is derived from a business in which [a borrower] maintains a majority owner interest or can otherwise exercise control over the business' activities." (*id.* at p. 36) The same section further requires that "where the applicant is self-employed, the applicant must submit his/her complete signed federal tax returns (business and personal) for the most recent two years plus year-to-date Profit and Loss Statement and Balance Sheet dated within 90 days of underwriting." (*id.*) The requirement that Borrower submit business tax returns was subject to waiver if, among other things, "personal tax returns … indicate income is increasing…." (*id.*) Therefore, according to the Seller's Guide, Defendant had an obligation to, at least, obtain and review personal tax returns in order to determine Borrower's ability to service his total debt obligation.

The Sellers Guide defines Reduced Documentation loans – including the Loan – as "credit packages[s] which allow … little or no income, employment or asset verification." (Seller's Guide at § 800.) The "Program Profile" for a stated income loan reads, in part, as follows:

- Income/Employment

7

- Employment must be disclosed on the signed 1003 covering a two-year period.
- All income sources must be itemized on the signed 1003.
- Verification of income is not required.
- Income must be reasonable for employment disclosed.

….

- Assets must be verified for reserves, closing costs and required down payment.
- Ratios are calculated based on stated income.

….

(Program Profile at p. 6.) However, immediately preceding the explanation of the different program profiles under the heading "DOCUMENTATION" is explained that "Full/Alt Documentation *may* be required if: [¶] … [the] [f]ile contains documentation which suggests borrower's income is not accurately stated on the signed 1003…." (*Id.*)(emphasis added.) Correspondingly, the Seller's Guide at Section 502 specifies that "[r]educed [d]ocumentation … programs do not eliminate the necessity to closely review and evaluate all information available in the file to determine the reasonableness of the borrower's ability to repay the mortgage debt. [¶] Reasonableness [is] based on the borrower's employment history, income source and past credit experience.… Borrower's income source must be from a source likely to generate sufficient income to repay the debt." (Seller's Guide at § 502.) The Seller's guide further specifies that full documentation *should* be required by the underwriter where the income reported by the borrower is "unusually high income for the profession…" but that "requests for additional information or documentation will be driven by common sense, sound credit judgment and loan characteristics … [and] vary depending on products selected." (*Id.*)

      There appears to be a conflict between the Seller's Guide requirement that qualifying income be verified (Seller's Guide at §505.2) and the Program Profile which specifies that income need not be verified for a stated income loan (Program Profile at p 6). What remains consistent is that both documents indicate that the underwriters are required to review all documents in the loan file to determine reasonableness of Borrower's ability to repay the debt based on employment history, income source, and credit experience (Seller's Guide at §§ 502, 703(12)) but are given some measure of control over whether or not to require additional documentation from the Borrower. This Court has been directed to no evidence tending to

indicate that Borrower's tax returns were ever submitted to Defendant prior to approval of Borrower's loans or what items were contained in the loan file.[1] Since it is unclear what items were contained in the loan file and whether Defendant actually reviewed any of Borrower's tax documents prior to originating the loan and since the Court cannot determine that a reasonable jury could only conclude that Defendant should have (by the terms of the contract) obtained Borrower's tax records, the Court cannot determine whether Defendant breached the terms of the Seller's Guide when it failed to make the determination that Borrower's stated income was unreasonable based on information contained in Borrower's tax documents and/or the loan file.

2. *Misrepresentation of Gross Income*

Plaintiffs argue that Defendant is in breach of contract because, despite Defendant's representation that no untrue information was contained in the loan file and no omissions were made that would tend to make the loan information misleading (Seller's Guide at §§ 702(8), 703(1), 703(12)), Borrower's gross income was misstated. Defendant alleges that by reporting an estimate of the monthly gross revenue from Borrower's business as his "Gross Monthly Income" – rather than the average monthly net profit from his business – that his income was misrepresented.[2]

As both parties have pointed out, Defendant indicated in the comment section of the Uniform Underwriting and Transmittal Summary that "BORROWER STATED INCOME PER THE 1003, HOWEVER ASSETS DO NOT SUPPORT. REASONABLE INCOME BASED ON PROFESSION AND ASSETS WOULD BE APPROX. $7,500 WHICH WOULD STILL QUALIFY WITH 43 BACK END." (Doc 47-2 at p. 2.) Plaintiffs contend that the underwriter's statement indicates that Defendant was aware that the monthly gross income amount was

---

[1] It is undisputed that Borrower's 2007 and 2008 tax returns could not have been in the loan file because they were not filed until 2009. (PSUF at ¶ 38.) It is also undisputed that Borrower's 2004 and 2005 tax returns were not contained in the loan file that was transmitted to Plaintiff. (PSUF at ¶ 39.)

[2] As to Plaintiffs' contention that Borrower's reporting of a zero income on his personal tax return indicates that he must have misrepresented his gross income, the court disagrees. A reporting of zero income on income tax return for a self-employed borrower is not necessarily an accurate measure of actual gross income. (*See In re Marriage of Calcaterra & Badakhsh,* 132 Cal. App. 4th 28, 35 (2005) (where a discrepancy exited between a reported income for a loan at $40,000 per month and an income tax return at approximately $30,000 per year, the court recognized that, "the owner of a successful business and who has control of his or her income can structure income and the payment of expenses to depress income" for tax purposes.)

misrepresented. Defendant claims that the underwriter's comment "simply referred to the fact that Mr. Gonzalez's assets were lower than a professional earning $12,000 in gross monthly income but that Mr. Gonzales still qualified for the Loan based on his verified income." (Defendant's Reply at p. 13.) Then, in an apparent effort to qualify him for the loan that he sought, the underwriter substituted the figure of $7,500 as an estimate of Borrower's income based on his profession and available assets.[3] Defendant's reading is not unreasonable since Defendant, by the terms of the program profile, only had an obligation to verify Borrower's assets, not his income. Given the context, the "43 BACK END" could only be a reference to the debt to income ratio, which for an Alt-A Stated Income loan was required to be below 45 percent to qualify. (*See* Doc. 47-2 at p. 2 (where "Total All Monthly Payments" is listed at $3232.77. When a debt to income ratio is calculated using the figure of 3232.77 in monthly debt to $7,500 in income, the result is an debt to income ratio of approximately 43%.); Program Profile at p. 1.) The underwriter's indication that the reported gross income of $12,000 per month was unsupported by the Borrower's assets does not necessarily mean that borrower's gross income was incorrectly reported, simply that Borrower's assets were lower than expected for an individual that had a gross income of approximately $12,000 per month.

Defendant now argues that – despite the underwriter's assessment of Borrower's verified income – the $12,000 recorded as monthly income was an accurate measure of Borrower's gross monthly income. Defendant's argument relies on the premise that the gross income from Borrower's business is interchangeable with his personal gross income because Borrower was the sole owner of an unincorporated business. This argument has some support. *See, e.g., In re Martinez*, 2012 WL 4866692 (Bankr. C.D. Cal. Oct. 12, 2012) (where borrower represented that his gross monthly "Base Employment Income" as the entire amount of income from his ownership and operation of the his self-owned restaurant.); *In re Cacciatori*, 465 B.R. 545, 554 (Bankr. C.D. Cal. 2012) (borrower was not reckless where she represented the gross income from her business as "Applicant's Gross Income" and "the application form[] fail[ed] to specify

---

[3] Based on the record before this Court, it is unclear how the underwriter came to the $7,500.00 figure and no explanation has been offered by either party.

10

the particular income metric a self-employed individual was supposed to use in filling in the blank….") *but cf., In re Barlaam*, 2012 WL 3288725 (Bankr. C.D. Cal. Aug. 9, 2012) (borrower's "belief that 'Gross Annual' would include his company's gross revenue is patently unreasonable. Gross revenues (i.e. revenues before deducting expenses) are irrelevant to a borrower's ability to make loan payments").

The Uniform Underwriting and Transmittal Summary filled in reference to the Loan requires the underwriter to list the borrower's "Stable Monthly Income." (Doc. 47-2 at 2.) That section breaks potential sources of monthly income into sections for "Base Income," "Other Income," "Positive Cash Flow," and "Total Income." In the blanks for the sections labeled "Base Income" and "Total Income" is recorded as $12,000. Next, the Loan Application (Fannie Mae Form 1003) transmitted from Defendant to Plaintiffs contains a chart bearing a column heading of "Gross Monthly Income." (Doc. 54-6 at 2.) The first heading in the column is "Base Empl. Income." *Id.* In the blank provided, Borrower's base employment income is recorded as $12,000.

No section of the Seller's Guide defines the terms "Gross Income," "Base Income," or "Total Income." "Stable Monthly Income" is defined as "[t]hose amounts and sources that are determined, based on evidence of past receipt and current information, are (sic) reasonably expected to continue into the future." (Seller's Guide at § 800.) Further, "Borrower's income must be from a source likely to generate sufficient income to repay the debt." (Seller's Guide at § 502.) By itself, reporting of the estimated gross income of Borrower's business as Borrower's income does not appear to facially violate the terms of the Seller's Agreement. However, reporting gross business income without reporting "Job-Related Expense[s]" – as provided for in Form 1003[4] – "omit[s] to state a material fact required to be stated … to make the information and statements therein not misleading." (Seller's Guide at § 703(12).) Although the Court does not treat Borrower's 2006 tax return as dispositive on the issue of whether "Job-Related Expense[s]" were accurately reported, the disparity between the reported $112,819 of non-home related business expenses and the failure to report any "Job-Related Expense[s]" on the Form 1003 could only reasonably be found to render the latter false. The absence of the largest

---

[4] *See* Doc. 54-6 at p. 6 (where the space for "Job-Related Expense" is left blank.)

11

expected expense from a form required for approval of Borrower's loan, regardless of whether the omission was intentional or otherwise, is a material (*see* Seller's Guide at § 701 (where Defendant acknowledges that the truth and accuracy of each warranty and representation in the Seller's Guide is material to Plaintiffs' purchase)) misrepresentation against which Defendant warranted. (*See* Seller's Guide at §§ 703(1),(12), and (27); *see also, Lehman Bros. Holdings, Inc. v. 1st New England Mortg. Corp*, 2012 WL 3984413, *2 (D.Mass Sept. 12, 2012) (interpreting substantially the same Seller's Agreement to contain an allocation of risk of a borrower's misrepresentation to the seller).) Even if the agreement did not specify that the representations were each material, the failure to report expenses placed Borrower's debt to income ratio within a range that qualified him for the Loan where he otherwise would not have. (*See* Doc. 47-2 at p. 2 (where Borrower's "Total Debt / Income" is represented to be 26.940% based on the "Total Liability" figure calculated based on the representation that Borrower had no "Job-Related Expense").) Defendant was therefore in breach of contract when it failed to repurchase the Loan upon demand by Plaintiffs.

*3. Waiver of Breach*

Defendant argues that Plaintiffs have waived any breach of warranty based on misrepresentation of Borrower's gross income because the Uniform Underwriting and Transmittal Summary informed Plaintiffs that Borrower's verified income of $7,500.00 per month would qualify for the Loan. In support of its position, Defendant cites *Galli v. Metz*, 973 F.2d 145, 151 (2nd Cir. 1992), for the proposition that a party waives its right to sue for breach of contract if it "closes on a contract in full knowledge of the facts disclosed by the seller which would constitute a breach of warranty." Defendant omits the *Galli* court's qualification of the preceding rule; even where a buyer closes with full knowledge of the facts which would constitute a breach of warranty, a buyer does not waive the breach were buyer "expressly preserves his rights under the warranties." *Id.*

The Seller's Guide specifies that Plaintiffs' remedies for breach of warranties in the Seller's Guide and/or Loan purchase agreement have full force and effect notwithstanding any failure by Plaintiffs to examine the Mortgage Loan File unless expressly waived. (Seller's Guide

at §§ 701, 712.) This provision expressly preserves Buyer's rights under the warranties. Further, even if all gross income were correctly represented on the Form 1003 and Uniform Underwriting and Transmittal Summary, Borrower's expenses were not accurately disclosed and Borrower's debt to income ratio – required to be below 45% to qualify – was miscalculated such that it was within acceptable bounds. Plaintiffs expressly preserved their rights under the warranties and did not close on the contract with full knowledge of the facts constituting the breach.

Defendant also alleges that Plaintiffs have waived breach because they only requested Borrower's gross income. As discussed above, the debt to income ratio was also required to be calculated and was made based on Borrower's representations of gross income and total liabilities. Since Borrower's total liabilities – if nothing else – were misrepresented and unknown to Plaintiffs, Defendant's argument fails.

Therefore, there was no waiver of Plaintiffs' rights or remedies under the contract.

*4. Causation*

It is undisputed that Borrower defaulted on his loan on March 1, 2010. (*See* Doc. 54 at ¶ 19.) Plaintiffs allege that, after Borrower's default, they discovered the misrepresentations in the Loan and demanded that Defendant indemnify Plaintiffs in the amount of $187,750.23. (*See* Doc. 54-10.) Defendant refused to indemnify Plaintiffs.

Defendant contends that Borrower's default was not caused by any of his misrepresentations but was related to Borrower's subsequent loss of employment. Defendant's view of causation misses the mark.

The Seller's Agreement specifies that when any "[l]oan that is the subject of any breach of one or more representations, warranties or covenants" which materially and adversely affects the value of the Mortgage Loan, is acquired by Plaintiffs through foreclosure or abandonment, Defendant is required to pay the Repurchase Price for the purchased property or indemnify Plaintiffs for their loss. (Seller's Guide at § 710.) The same section specifies that Defendant "shall remain liable for all remedies [specified in the agreement], even if [Plaintiff] discovers a breach after the Mortgage loan is liquidated in foreclosure." *Id.* The two sophisticated parties agreed that where the three conditions – (1) breach of representation(s), (2) material and adverse

13

1  effect on the value of the loan, and (3) foreclosure – are satisfied then Defendant has an
2  obligation to pay the Repurchase Price or indemnify. As discussed, *supra*, a breach of the
3  representations in the Seller's agreement has taken place and the parties have agreed that
4  Borrower defaulted on the Loan and Plaintiffs foreclosed. In order to prove that the breach of
5  representations materially and adversely affected the value of the loan Plaintiffs must show that
6  the breached "caused [P]laintiff[s] to incur an increased risk of loss." *Wells Fargo Bank, N.A., v.*
7  *JPMorgan Chase Bank, N.A.*, 2014 WL 1259630, *4 (S.D. N.Y. Mar. 27, 2014); *Assured Guar.*
8  *Mun. Corp. v. Flagstar Bank, FSB*, 920 F.Supp.2d 475, 509 (S.D. N.Y. 2013) ("*Assured II*");
9  *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,* 892 F.Supp.2d 596, 603 (S.D. N.Y. 2012).
10 Where misrepresentation or miscalculation of a relevant data point – e.g., income, assets, debts,
11 or liabilities – would lead to a modified debt to income ratio that fell outside of the permissible
12 range (45% maximum here), the misrepresentation or miscalculation is deemed a material breach
13 if the deviation was sufficiently large that no compensating factor could have made up for the
14 deviation. *Assured II*, 920 F.Supp.2d at p. 509. As discussed, *supra*, an accurate measure of
15 Borrower's liabilities would have pushed his debt to income ratio well outside of the permissible
16 range (reflecting a likely inability to service the debt). Accordingly, that misrepresentation had a
17 material and adverse effect on the value of the Loan.

*5. Damages*

Defendant claims that Plaintiffs are not entitled to the entire Repurchase Price because Plaintiffs failed to mitigate damages when they "failed to act reasonably in the loan modification process," and because Plaintiffs did not notify Defendant of Borrower's default until after the nonjudicial foreclosure thereby depriving Defendant of an opportunity "try and make the Loan a performing loan by facilitating a modification." (Doc. 55 at p. 19.)

Defendant was required to, at Plaintiffs' option, pay the Repurchase Price for the purchased property or indemnify Plaintiffs for their loss. (Seller's Guide at § 710.) Plaintiffs elected to sell the Subject Property and demand indemnification from Defendant for Plaintiffs' loss. Defendant agreed to this remedy by accepting the terms of the Seller's Guide. Defendant's duty to indemnify Plaintiffs for loss sustained in the sale of the Subject Property exists

"regardless of … the dates of … notice to [Defendant of the Breach and [Plaintffs'] demand for" indemnification "even if [Plaintffs] discover[] a breach after the Mortgage Loan is liquidated in foreclosure." *Id.* Accordingly, Plaintiffs were under no obligation to inform Defendant – prior to the sale of the Subject Property – of the breach of Defendant's representations or warranties made during the underwriting process or of Borrower having defaulted on the Loan.[5] Nor were Plaintiffs obliged to provide Defendant an opportunity to cure.[6]

    Defendant has submitted no evidence to suggest that Borrower was eligible for a loan modification. Without any evidence of eligibility for modification, even if Plaintiffs had a duty to mitigate damages that included entering into a modification agreement – which this Court does not decide – there is no evidence that Borrower would qualify for such an agreement thus Defendant has not met its burden of proving that a diligent effort would have mitigated Plaintiffs' damages. *See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Cor.*, 846 N.Y.S.2d at 99.

    Accordingly, Defendant has not met its burden of establishing that Plaintiffs owed a duty to notify Defendant of Borrower's default or Defendant's breach of representation any sooner than it did. Further, Defendant has not met its burden of establishing that Plaintiffs' duty to mitigate included a duty to enter into a modification agreement and that if such a duty existed that Borrower was eligible for a modification or that a modification would have mitigated Plaintiffs' damages. Plaintiffs are therefore entitled to indemnification for their loss as the parties agreed in the Seller's Guide; the Repurchase price less the sale price of the Subject Property.

    The formula for calculation of the Repurchase Price is set out by the Seller's Agreement as follows:

---

[5] The cases that Defendant cites regarding Plaintiffs' failure to mitigate based on voluntary delay in either notifying Defendant or in filing suit are inapposite. It is the burden of the breaching party to establish not only that the plaintiff failed to make diligent efforts to mitigate damages but also the extent to which such efforts would have diminished its damages. *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Cor.*, 846 N.Y.S.2d 95, 99 (App. Div. 2007). Such is not the case before this Court. Defendant has submitted no evidence that in any way tends to indicate that Plaintiffs were not reasonable in their attempt to mitigate damages. Defendant simply claims that delay in notifying Defendant or filing suit by themselves fail to mitigate damage. The Court has found nothing in the record or in relevant caselaw to support either proposition.

[6] It is unclear how Defendant intended to cure the breach of contract considering that breach consisted of misrepresentation which had already been relied upon. Even if Defendant had facilitated a modification it would still have been in breach of contract.

15

> An amount equal to (i) the greater of the Purchase Price or [Price Adjustment Factor] multiplied by the outstanding principal balance of the Mortgage Loan as of the Purchase Date; less (ii) the aggregate amount received by [Plaintiffs] of reductions and curtailments of the principal balance of the Mortgage Note; plus (iii) any and all interest payable on the outstanding principal balance of the Mortgage Note as of the date of repurchase; plus (iv) any and all expenses, including, without limitation, costs of foreclosure and reasonable attorney's fees, incurred by [Plaintiffs] in the exercise by [Plaintiffs] of [their] rights and remedies in connection with the Mortgage Loan, the Mortgaged Property, and/or the Mortgagor, as more specifically identified in th[e] Seller's Guide.

(Seller's Guide at § 800.) The Repurchase Price calculation is an adequate method for calculating damages. *Aurora Commercial Corp. v. Approved Funding Corp.*, 2014 WL 1386633, *5 (S.D. N.Y. April 9, 2014) (applying the same damage calculation after a refused demand for repurchase). As to the first variable, the Purchase Price[7] of the loan was $228,039.71. (SF at ¶ 5.) The outstanding principal balance of the Loan at the time of sale appears to have been $231,300; the original principal amount.[8] However, Plaintiffs provide no information regarding the Price Adjustment Factor for the Loan. Accordingly, this Court will proceed with the calculation using the Purchase Price for variable one of the Repurchase Price calculation.

As to the second variable, Plaintiffs received an aggregate of $855.23 in payments from Borrower toward the principal balance in the time between Plaintiffs' purchase of the note and Borrower's default. (*See* Doc. 54-9.) The Purchase Price less the aggregate principal balance reductions received by Plaintiffs results in a balance of $227,184.48

As to the third variable, Plaintiffs seek to recover based on a term of interest accrual at the rate specified on the note from the date of Borrower's default (March 1, 2010) to the date of Defendant's breach of contract (July 15, 2012). The problem with this calculation is that the note no longer accrued interest in Plaintiffs' favor after Plaintiffs sold the Subject Property. The Repurchase Price calculation assumes that Defendant repurchased the Loan from Plaintiffs.

---

[7] The Purchase Price was the "price paid … by [Plaintiff] to [Defendant] in exchange for the [Loan] purchased on the Purchase Date. (*See* Seller's Guide at § 800.)

[8] Plaintiffs' calculation of Repurchase Price is based on the outstanding principal amount at the time of Borrower's default. The formula for calculation of Repurchase Price provided in the Seller's Agreement does not include the outstanding principal at the time of Borrower's default. Rather, the outstanding principal balance at the time of default is the result of the first two steps when the value used for the first consideration is Price Adjustment Factor multiplied by the outstanding principal balance as of the Purchase Date. (*See* Seller's Guide at § 800.)

Since Plaintiffs have instead sought indemnity for the difference between the Purchase Price and payout of the foreclosure sale, an accurate measure of interest runs only from the date of Borrower's default to Plaintiffs' sale of the Subject Property (April 21, 2011); 416 days. The note rate of 7.025% (*See* Doc. 47-10 at ¶ 2.) is the correct rate of annual interest accrual and the outstanding principal balance of $230,444.77 (*See* Doc. 54-9 at p. 1) at the time of default is the correct figure from which to calculate the interest. The annual interest on the outstanding principal balance was $16,188.75 ($230,444 (principal due at time of default) * 7.025% (note interest rate)). Accordingly, the daily interest accrual was $44.35. The total interest accrued from the date of default to the date of the foreclosure sale was $18,449.60.

As to the fourth variable, Plaintiffs have provided the Court with claims for "escrow advances" and "corporate advances" without explanation as to what each is or how or why either was incurred. For this variable Plaintiffs have provided inadequate evidence and Plaintiffs' reference to the mortgage loan history (Doc. 54-9) is of little assistance.

Based on the evidence before the Court, the appropriate Repurchase Price (not including attorney's fees) is 245,634.02. After deducting the $71,909.14 recovered by Plaintiffs in the sale of the Subject Property, Plaintiffs are entitled to be indemnified in the amount of $173,724.94.

**V. Order**

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Defendant's motion for summary judgment is DENIED;
2. Plaintiffs' motion for summary judgment is GRANTED as follows;
   a. Defendant is ordered to indemnify Plaintiffs in the amount of $173,724.94;
   b. Plaintiffs may submit an accurate accounting of expenses incurred in foreclosing upon the Subject Property and attorney's fees incurred in pursuing the remedy granted herein.

IT IS SO ORDERED.

Dated:   September 19, 2014                               _____
                                                SENIOR   DISTRICT   JUDGE